# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

FEDERAL DEPOSIT INSURANCE
CORPORATION, as Receiver for
Colonial Bank,

     Plaintiff,

v.

PRICEWATERHOUSECOOPERS
LLP and CROWE HORWATH LLP,

     Defendants.

Case No. 2:12-cv-00957-WKW

## SECOND AMENDED COMPLAINT

Plaintiff Federal Deposit Insurance Corporation, in its capacity as Receiver of Colonial Bank of Montgomery, Alabama, and pursuant to the Court's Memorandum Opinion and Order dated September 10, 2013 (Doc. No. 52), files this Second Amended Complaint against PricewaterhouseCoopers LLP and Crowe Horwath LLP.

## I. INTRODUCTION

1.    On August 14, 2009, the Alabama State Banking Department closed Colonial Bank ("Colonial" or "the Bank") and named the Federal Deposit Insurance Corporation as Receiver ("FDIC"). Colonial's closure was triggered by the discovery that its largest mortgage banking customer, Taylor Bean & Whitaker

Mortgage Corp. ("TBW") had committed a massive, multi-year fraud against Colonial, resulting in financial statements that grossly misstated Colonial's true financial condition.  The TBW fraud left a huge hole in the assets reported on Colonial's books and ultimately cost the Bank enormous losses.

2.      At all relevant times during this fraud, PricewaterhouseCoopers LLP ("PwC") served as the Bank's external auditor, and Crowe Horwath LLP ("Crowe") provided internal audit services to the Bank.  All the time that TBW was carrying out an increasingly brazen and costly fraud against Colonial, PwC and Crowe never realized that many hundreds of millions of dollars of Bank assets did not exist, had been sold to others, or were worthless.  Rather, as demonstrated more fully below, PwC repeatedly issued unqualified opinions that Colonial's financial statements were fairly stated and effective internal controls were in place, while Crowe consistently overlooked serious internal control issues and failed to evaluate properly controls for the financing programs used by TBW.  Missing huge holes in Colonial's balance sheet and serious gaps in internal control, PwC and Crowe continued to perform auditing services for Colonial without ever detecting the TBW fraud.  Had they performed their auditing work in accordance with applicable professional standards, they would have learned of the TBW fraud in time to prevent additional losses suffered by Colonial at the hands of TBW.

3.     In its role as Receiver of Colonial, the FDIC has identified numerous acts and omissions constituting professional malpractice, gross negligence, breach of contract, and negligent misrepresentation committed by PwC in connection with its year-end 2007 audit engagement, subsequent quarterly reviews, and consulting for the Bank, and acts and omissions of professional malpractice, gross negligence, and negligent misrepresentation committed by Crowe in connection with its 2006 and 2007 outsourced internal audit and consulting services provided to the Bank. In the absence of PwC's and Crowe's wrongful acts, the TBW fraud would have been discovered by 2007 or early 2008, and losses currently estimated to exceed $1 billion would have been avoided.  This lawsuit seeks to recover these losses.

## II.  PARTIES, JURISDICTION AND VENUE

4.     Plaintiff FDIC is organized and existing under the laws of the United States of America.  Upon being named Receiver for Colonial Bank, the FDIC succeeded to all rights, titles, powers, and privileges of Colonial, including, but not limited to, Colonial's claims against its former professional service providers such as PwC and Crowe.  12 U.S.C. §1821(d)

5.     Defendant  PwC  is  a  Delaware  limited  liability  partnership headquartered in New York with partners located throughout the United States.

6.     Defendant  Crowe  is  an  Indiana  limited  liability  partnership headquartered in Illinois with partners located throughout the United States.

7.     This Court has subject matter jurisdiction over this suit pursuant to 12 U.S.C. §1819(b)(1) and (2) and 28 U.S.C. §§1331 and 1345.  The FDIC has the power to sue in any court of law. 12 U.S.C. §1819(a).  Venue is proper in this District under 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## III. BACKGROUND

8.     Colonial, a wholly-owned subsidiary of Colonial BancGroup, Inc. ("BancGroup"), was headquartered in Montgomery, Alabama, and had 347 offices located in Alabama, Georgia, Florida, Texas, and Nevada.  The majority of Colonial's branches were located in Florida as was its mortgage warehouse lending division which was based in Orlando, Florida.

## A.  Colonial's Mortgage Warehouse Lending Division (MWLD)

9.     Colonial's MWLD provided short-term, secured financing to various mortgage originators.  The MWLD accounted for approximately 20 percent of Colonial's reported net income from 2005 to 2009 and, as of June 2009, the MWLD's $5.2 billion in reported assets represented approximately 20 percent of Colonial's total assets.

10.     The MWLD's assets fell mainly into three categories:  (1) mortgage warehouse lines of credit, (2) mortgage loans held for sale – known as the COLB (acronym for Colonial Bank) facility, and (3) the Assignment of Trade (AOT)

4

facility, which was reported as part of securities purchased under agreements to resell.  TBW was by far the largest customer of the MWLD.  As of June 2009, $3.3 billion of the MWLD's $5.2 billion in total reported assets (63 percent) were attributable to TBW business.

11.     The COLB facility was a loan participation arrangement under which Colonial purportedly purchased a 99 percent participation interest in individual mortgage loans from TBW.  Under the COLB facility, Colonial's customer was required to have takeout investors already committed so that Colonial would receive payment for its participation interest from the sale of the loans to secondary market investors within a relatively short time period, typically 30 to 60 days after closing.  Without committed purchasers, COLB funding was not available.  If a given takeout purchase did not take place – for example, if a loan did not meet the purchaser's requirements – TBW was obligated to repurchase the loan upon request by Colonial.

12.     The AOT facility, introduced in 2004, was set up to purchase participation interests in loan pools that were to be packaged and securitized for sale in the secondary market.  TBW was the only MWLD customer allowed to use the AOT facility.  Colonial purchased a 99 percent participation interest in the loan pools and was to be repaid when the securities backed by the loan pools were sold to the end investor.  Like COLB, an essential condition of an AOT transaction was

that the loans in a pool meet the requirements of the end investor and, if the takeout purchase failed, TBW was required to repurchase the pool at Colonial's request.

**B.  The TBW Fraud Against Colonial**

13.    As alleged more fully below, TBW chairman Lee Farkas and treasurer Desiree Brown conspired with two MWLD employees, Catherine Kissick (head of the MWLD) and Teresa Kelly (operations supervisor reporting to Kissick) to defraud Colonial by obtaining large amounts of MWLD financing for TBW without providing required collateral, thereby effectively stealing money from Colonial.    The MWLD employees involved in this fraud had completely abandoned the interests of Colonial and were acting solely for their own benefit or the benefit of TBW.

14.    Although Farkas's greed to maintain his lavish lifestyle and mask the insolvency of TBW were the inspirations for the conspiracy, it was Kissick who invented – and through her assistant Kelly orchestrated – many of the fraudulent details of this conspiracy.

15.    Farkas and Brown, along with Kissick and Kelly and other TBW insiders, were convicted of conspiracy to commit bank fraud and other charges for their role in the ever-increasing and evolving fraud.    At no time did this fraud benefit Colonial; rather, the fraud perpetrated was against Colonial, harmed Colonial, was to the detriment of Colonial and resulted in Colonial lending TBW

many hundreds of millions of dollars that were secured by worthless or non-existent loans. These actions also allowed Kissick and Kelly to keep their salaries and bonuses and stay out of jail.

16.    Kissick and Kelly knew that Farkas, their confederate in crime, was not only a criminal, but a pathological liar and fraud who had been expelled from the Fannie Mae mortgage program due to the sale of fake and fraudulent loans to Fannie, and who was stealing money from mortgagor tax and insurance escrow accounts.  Kissick and Kelly repeatedly caught Farkas in lies and fraudulent transactions outside the scope of Plan B, including diverting funds intended to buy mortgages to buy Farkas an expensive jet aircraft, funneling money to pay Farkas's personal expenses and the expenses of his clubs and personal associates, and the use by Farkas of forged documents.

Account Sweeping

17.    At least as early as 2002, Kissick and Kelly allowed overdrafts to be paid out of the TBW master operating account with Colonial's MWLD by tens of millions of dollars per day.   These overdrafts, as was known to the TBW conspirators, were used to cover losses and expenses arising in TBW's business and to fund defalcations and benefits for Farkas.  To conceal these overdrafts, and to prevent their appearance on the Bank's overdraft reports, Kissick and Kelly, near the close of business each day, transferred funds into the TBW master account

to cover the overdrafts.  The source of the transferred funds was a restricted TBW account containing the proceeds of the sales of Colonial's collateral, which was designated to be applied to TBW's indebtedness to Colonial.  The effect of these transfers was the temporary deposit of the Bank's collateral into TBW's master operating account to conceal any overdraft.  The overdraft report was generated based on the status of the accounts at the end of each day, and due to the fraud, the report did not reflect the TBW overdrafts.  After the reports were processed, Kissick and Kelly would transfer Colonial's funds back into the investor funding account and, as new overdrafts appeared, start the process all over again.  The overdrafts grew to over $120 million by December 2003, and Kissick and Kelly diverted a corresponding amount of the Bank's collateral proceeds to conceal the overdrafts.

COLB Plan B

18.    In December 2003 the conspirators implemented "Plan B," which was conceived as a way to steal and convert the Bank's assets through the corruption of the Bank's COLB facility with TBW.  Under Plan B, TBW "sold" mortgage loans to Colonial and used the proceeds to finance its operations rather than to fund mortgages.  However, the loans that Colonial "purchased" under Plan B either did not exist; had been sold or pledged to other banks or investors; were foreclosed, paid off, or charged off loans; or were otherwise unmarketable.  Thus, Plan B loans

provided worthless collateral to Colonial in exchange for money advanced by the Bank because the loans had little or no value to Colonial.  Through this scheme, by mid-2005 Kissick and Kelly had helped TBW steal $250 million from Colonial.

AOT Plan B

19.    As the balance of the COLB Plan B loans grew, it became increasingly difficult for the conspirators to avoid detection by Colonial's loan monitoring software which tracked details of COLB loans individually.  But the software did not track loans in pools.  In or around December 2004 the conspirators set in motion a new scheme designed to transfer the Plan B deficit (or "hole") from COLB to the AOT facility.  Under the AOT version of Plan B, the conspirators arranged for TBW to sell pools containing fake or greatly impaired loans to Colonial in return for additional funding from the MWLD.  As in COLB, the AOT Plan B loan pools were basically worthless to Colonial because they consisted of nothing more than bogus data purporting to capture the value of real loans or data for loans that TBW had previously sold to other investors, or loans having little or no value.  As a result, there were nonexistent loans in the Plan B AOT pools purchased by Colonial, or the loans had been sold or pledged to other banks or investors; were foreclosed, paid off, or charged off loans; or were otherwise unmarketable.  The amount of Plan B pools held by the MWLD at the end of 2007 is estimated to be at least $561 million.

20.     In order to conceal the AOT Plan B fraud, Kissick and Kelly falsified the Bank's records and placed fictitious loans and loan pools on Colonial's books in recycling round-trip transactions up until the eve of Colonial's failure.

<u>The Continuation of the Fraud and Double and Triple Pledging</u>

21.     Beginning in 2008, and particularly in 2009, TBW and its subsidiary, with the assistance of others, stole almost $1 billion in loans from Colonial by representing that TBW or its subsidiary would pay Colonial for the loans, but instead pledging or selling the loans to third parties without paying Colonial as promised.  Because discovery has not yet commenced in this case, the FDIC has not obtained documents and information needed to detail the mechanics of the so called double and triple pledging fraud (which is discussed more fully below in ¶¶'s 21(a) though 21(g)) and all of the acts taken in furtherance of the fraud by each participant.   The FDIC expects that, as discovery progresses, significant additional information bearing on this latest phase of the TBW fraud will be developed.   Based on the facts FDIC has learned thus far, the double and triple pledging proceeded as set forth below.

a.     Every phase of the fraud -- sweeping, Plan B COLB, Plan B AOT and the double and triple pledging  -- had the same goals:  Cover TBW's losses, fund Farkas's lavish lifestyle, prevent the fraud from being discovered, and the consequences that would occur once it was discovered.

b.     The last phase of the fraud, the double and triple pledging phase, was conducted through the Colonial COLB facility, under which Colonial purchased 99% participation interests in mortgage loans which TBW arranged to sell to secondary market investors.   In the double and triple pledging phase, TBW stole hundreds of millions of dollars from Colonial to fund TBW's operations by converting the sales proceeds for its own use without paying Colonial.   The Plan B phase of the fraud, described above, in which Colonial provided funds to TBW to purchase loans under the COLB facility or loan pools under the AOT facility that either did not exist, had been sold to others, or were valueless in any event, was fully operational during 2007 and the first part of 2008, the period when PwC and Crowe were conducting the audits at issue here.   If the auditors had fulfilled their professional duties, they would have detected and reported the Plan B fraud to Colonial's management and Board, which would have resulted in the termination of the Bank's relationship with Farkas, TBW and its affiliates, the termination of the COLB facility where the double and triple pledging losses were incurred, and the immediate termination of Kissick and Kelly.   The failure of the Bank's auditors to detect the fraud foreseeably resulted in the continuation of the fraud.   In other words, the audit failures of PwC and Crowe as described herein produced the losses described below in a natural and continuous sequence, unbroken by any new

intervening, superseding or independent cause, and without which the injury would not have occurred.

c.    Moreover, PwC's negligent approval and improper application of sales accounting treatment also caused the losses described below because the sales accounting treatment evaded limitations on loans to one borrower under applicable banking regulations.   Under proper accounting treatment, the funds advanced under the COLB line would have been limited so drastically that the Bank could not have advanced funds on the loans that were double and triple pledged by TBW in 2008 and 2009.   This was a foreseeable result of improper sales accounting treatment because, as PwC knew, the use of sales accounting treatment circumvented the Bank's lending limits and allowed far greater advances to TBW.

d.    In or around July 2008, Kissick stopped making Plan B advances to TBW, but continued massive efforts to conceal the Plan B phase of the fraud from Colonial's management and directors.   In furtherance of the fraud, Farkas, Brown, Kissick, Kelly and others carried out sham transactions, which they called "recycling," in which unmarketable Plan B AOT pools were supposedly sold by Colonial and TBW to TBW's affiliate, Ocala Funding ("Ocala"), and Ocala, in turn, supposedly sold to TBW and Colonial "new" Plan B AOT pools that likewise had no value to Colonial.   These sham transactions included the wiring of hundreds of millions of dollars of Colonial funds to Ocala, through LaSalle Bank

("LaSalle"), and Ocala wiring approximately the same amount of funds back to Colonial.  The purpose of the "recycling" transactions was to conceal the fraud by avoiding the scrutiny that would result if AOT pools remained on Colonial's books too long and by falsely making it appear that the fake AOT pools had been sold and replaced by new pools.  These recyclings continued until the conspirators were prevented by the FBI and other law enforcement authorities from continuing the fraud in or around August 2009.

e.   After Kissick informed Farkas in or around July 2008 that the Plan B advances would cease, Kelly grew suspicious of where Farkas was getting funds for TBW now that Kissick had stopped the Plan B advances.  This concern was logical given that TBW had been unable to pay its operating expenses for the last six years without stealing money from Colonial with the aid of Kissick, Kelly and others.  Following discussions with TBW's treasurer (Brown), Kelly believed that Farkas was diverting Colonial's sales proceeds to keep TBW in business and pay its bills.  Kelly says she reported her concerns to Kissick.  In any event, Kissick and Kelly continued to allow, and in the case of Kissick to approve, Colonial's COLB advances to TBW, through which Colonial purchased 99% participations in loans from TBW that were later sold to Ocala, with LaSalle serving as the custodian.  Numerous COLB transactions involving TBW, Ocala, and LaSalle – the same participants involved in the fraudulent AOT recycling transactions –

eventually became double and triple pledged transactions, and alone (not including additional nine-figure Plan B losses after 2007 that also were caused by TBW's frauds against Colonial) resulted in an estimated $898.9 million in losses to the Bank and the FDIC. Specifically, after Colonial purchased its 99% interest in the COLB loans from TBW, the loans were shipped to Colonial, and then from Colonial to LaSalle, as custodial agent in connection with purchases by Ocala, with funds provided by Freddie Mac, the end investor and ultimate owner of the loans. Farkas, used the transactions as a way to steal money from Colonial, just as he had done ever since the fraud began in 2002, this time by directing LaSalle to transfer the sales proceeds from Colonial's loans to TBW or to pay TBW's debts rather than repay Colonial for its 99% interest.  Kelly and Kissick were willfully blind to the double and triple pledging fraud.

f.    The double and triple pledging phase not only involved stealing Colonial's sales proceeds, but also defrauded various other lenders by pledging Colonial's interest in COLB loans to them to secure additional funds.  The double and triple pledging fraud constitutes a theft of Colonial's sales proceeds and is analogous to the initial "sweeping" phase of the fraud, in which Colonial's sales proceeds were swept out of Colonial's collateral funding account into the TBW master operating account to cover TBW's overdrafts incurred to pay its operating expenses.

g.     In 2009, Colonial shipped thousands of COLB loans to TBW and/or

Ocala for which it had not been paid in the time required under various agreements

between TBW and Colonial.  At one point, Cherie Fite ("Fite"), an employee in

Colonial's MWLD, sent TBW's Brown an email requesting that certain unpaid

loans be returned to Colonial, as was Colonial's right under such agreements.

Kissick was informed about Fite's request and Kissick told Fite in an email that

she did not want the loans shipped back at that time.  Under the circumstances and

based on the significant amounts that TBW then owed Colonial, pursuing the issue

could potentially result in exposure of the longstanding, ongoing fraud, although

Kissick told Fite that the shipped but unpaid loans that Fite had discovered would

be paid that week.  Kissick told Fite that the reason Colonial had not been timely

paid was because of funding delays.  Fite responded that she was not aware of

funding delays at the time of this incident.  Colonial still had not received payment

by the following week.  Then, on August 4, 2009, after having been interrogated

by the FBI in an interview in which she later admitted she was not honest, Kissick

emailed TBW, asking that the loans be returned.  To the end, as she had done

throughout, Kissick facilitated acts, or was willfully blind to acts, by which Farkas

and TBW defrauded Colonial and took many millions of dollars of Colonial's

money – funds that Colonial would never recover.  As shown, the double and triple

pledging fraud was merely the next phase in a continuum of evolving fraud TBW

committed against the Bank and would have been prevented had PwC and Crowe properly performed their audits in compliance with applicable professional standards. The losses suffered by the Bank and the FDIC as a result of the long-term fraud, including but not limited to the theft of COLB loan sales proceeds described above, are at least $1 billion.

**C. PwC's Audit of Colonial**

22. At all times during TBW's fraud against Colonial, PwC served as Colonial's external, independent auditor under engagement agreements with Colonial's parent company, BancGroup. Pursuant to the engagement letter for the 2007 audit, PwC was obligated to (a) perform its audit in accordance with standards established by the Public Company Accounting Oversight Board ("PCAOB"), (b) design the audit to obtain reasonable assurance of detecting errors, fraud, or illegality that would have a material impact on financial statement amounts, and (c) obtain reasonable assurance that effective internal control over financial reporting was maintained in all material respects, which required PwC to obtain an understanding of internal controls over financial reporting, assess the risk that a material weakness existed, and test and evaluate the design and effectiveness of internal controls over financial reporting. BancGroup was a single-bank holding company with Colonial as its only asset of any significance. Accordingly, an audit of BancGroup consisted of an audit of Colonial. Upon information and belief,

PwC knew that its audit of BancGroup's consolidated financial statements served as the audit required by 12 U.S.C. § 1831m.  At the conclusion of each audit, PwC reported that PwC had performed its audit work in accordance with applicable professional standards and that BancGroup's financial statements were fairly stated in all material respects in accordance with Generally Accepted Accounting Principles ("GAAP"), and that effective internal controls over BancGroup's financial reporting were in place.

23.    In fact, PwC's audit of Colonial's 2007 financial statements (and other years) fell short of governing professional standards in several respects.  If PwC had performed its audit work properly, it would have discovered the TBW fraud and Colonial would have avoided the damages the FDIC seeks against PwC in this complaint.

### 1. Applicable Auditing Standards

24.    PwC's 2007 audit of the consolidated financial statements of BancGroup and Colonial and the effectiveness of BancGroup's internal controls over financial reporting was an "integrated audit."  Under PCAOB requirements, integrated audits by a PCAOB-registered public accounting firm such as PwC must be conducted in accordance with PCAOB Auditing Standards.  These standards adopted Generally Accepted Auditing Standards ("GAAS") as they existed on April 16, 2003, subject to amendment or supplementation by the PCAOB.  (For

ease of reference, GAAS standards that were adopted by the PCAOB will be referred to as GAAS and cited as AU.  Standards enacted by the PCAOB will be referred to as AS.).  There are ten GAAS standards applicable to PwC's audit of Colonial, the most important of which for purposes of this case are:

- The auditor must adequately plan the work and must properly supervise any assistants.

- The auditor must obtain a sufficient understanding of the entity being audited and its environment, including its internal controls, to assess the risk of material misstatement of the financial statements whether due to error or fraud, and to design the nature, timing, and extent of further audit procedures.

- The auditor must obtain sufficient competent evidential matter to afford a reasonable basis for an opinion regarding the financial statements under audit.

25.    GAAS and AS also require the auditor to understand (i) the audit client, customer relationships, industry conditions, economic conditions, regulatory environment, relevant accounting pronouncements, and other external factors; and (ii) the internal controls that the audit client has in place to determine whether they are designed properly and operate effectively.

26.    To comply with GAAS, the auditor needs to identify risks of material misstatement at appropriate levels of detail, and design appropriate auditing procedures in light of such risks.  Due professional care requires the auditor to exercise professional skepticism – i.e., a questioning mind and a critical

assessment of audit evidence based on the assumption that management is neither dishonest nor honest beyond doubt.

27.    Under GAAS and AS requirements, which audit procedures the auditor selects generally depend on the risk of material misstatement.  The higher the auditor's assessment of risk, the more reliable and relevant the audit evidence obtained from tests of the effectiveness of internal controls and substantive audit procedures must be.  The auditor must plan and perform the audit to obtain sufficient competent evidential matter to afford a reasonable basis for an opinion regarding the financial statements and to reduce to a low level the risk that the auditor will fail to detect a material misstatement.  If the auditor is unable to obtain sufficient competent evidential matter, the auditor should express a qualified opinion or a disclaimer of opinion.

### 2.  Elevated Risk of Fraud Affecting PwC's 2007 Audit

28.    Throughout 2007 home prices were falling in regions of the country that had recently witnessed major booms, mortgage loan originators were suffering from eroding markets, homeowners with subprime and other high-rate mortgages were defaulting in increasing numbers and, by the summer of 2007, many markets for mortgage-backed securities ("MBS"), particularly securities backed by residential mortgage loans, had all but frozen.

29.     PwC knew or should have known that TBW's business model depended on its ability to sell mortgage loans to the secondary market, and that the deterioration of that market likely would create financial pressures for TBW and give it a powerful incentive to exploit its relationship with Colonial's MWLD. Operating in this environment significantly increased the risk that Colonial's financial statements could be materially misstated due to fraud.

### 3.  PwC's Failure To Follow Required Auditing Standards

#### a.     Failure to Understand Colonial's MWLD and Associated Risks

30.     PwC failed to obtain a sufficient understanding of Colonial's MWLD operations to plan the audit properly, make an accurate assessment of audit risks, and design effective audit procedures.  PwC also relied on tests purportedly performed by others to confirm the effectiveness of internal controls, but it failed to recognize that no such tests had in fact been conducted.  Finally, in a number of specific areas, PwC's execution of planned audit procedures was carried out so carelessly that the audit evidence did not provide a valid basis for its conclusions and its unqualified audit opinion.

31.     PwC violated GAAS during the audit planning process by not giving adequate consideration to significant audit issues and risks stemming from recent adverse developments in U.S. mortgage markets, the very type of transactions underlying MWLD financing for TBW, and the concentration of Colonial's

business in TBW.  Deteriorating conditions in the secondary market during 2007 created a risk that Colonial's holding period for loans and loan pools held in the COLB and AOT facilities might extend beyond the expiration date of the takeout investor's commitment or that investors might lose their appetite for these products.  The significant concentration of Colonial's MWLD business with TBW gave rise to additional risks associated with that particular customer.

32.    These circumstances were serious fraud risk factors that significantly increased Colonial's risk of loss from MWLD financing and risk of a material misstatement of MWLD assets.  Yet PwC's audit design was devoid of appropriate procedures to address these risks.

### b.    Failure to Properly Evaluate Internal Controls

33.    For public companies like BancGroup, Section 404 of the Sarbanes-Oxley Act of 2002 ("SOX 404") makes corporate management responsible for assessing the effectiveness of internal controls over financial reporting.  As part of its integrated audit, AS No. 5 required PwC to render an opinion on the effectiveness of these internal controls.  Moreover, PwC was required to test the effectiveness of Colonial's internal controls if PwC intended to rely on such controls in order to limit the substantive audit procedures that it performed.

34.    BancGroup retained Crowe to evaluate internal controls in accordance with management's obligations under SOX 404.  In connection with its integrated

audit pursuant to AS No. 5, PwC relied on Crowe's SOX 404 work for purposes of identifying key controls.  PwC knew that walkthroughs would be necessary for significant processes affecting significant accounts, but intended to rely on walkthroughs performed by Crowe for lower risk areas.[1]  PwC anticipated that Crowe would submit its testing plan to PwC for review.  Upon ensuring that Crowe's testing plan satisfied applicable audit standards, PwC would check the quality of Crowe's testing through independent verification.

35.    PwC knew that Colonial's Treasury and Securities Purchased Under Agreements to Resell (which included $1.5 billion in AOT financing for TBW at December 31, 2007) was a "Significant Process" for which it would test controls. During the actual audit, however, PwC excluded AOT entirely from the key controls that it tested despite AOT's significant account balance and distinct class of transactions (all with TBW) that called for transaction-specific controls.  PwC did not perform any AOT walkthroughs.  Upon information and belief, PwC skipped this crucial step because key controls relating to AOTs were not properly identified by Crowe, and/or PwC did not properly assess the inherent risks regarding the existence and validity of AOT assets.  PwC instead decided that it would rely on Crowe to perform all AOT walkthroughs.

---

[1]   A walkthrough consists of following a transaction from origination through the company's processes, including information systems, until it is reflected in the company's financial records, using the same documents and information technology that company personnel use.

36.     PwC was required to review Crowe's work product, and PwC did so. Crowe, however, never identified or performed any evaluation of internal controls specifically relating to the AOT facility, and there was no documentation suggesting otherwise.   Nonetheless, PwC concluded that internal controls for Colonial's Treasury (including AOT) operation were effective and could be relied upon by PwC to reduce its substantive audit procedures for the MWLD's AOT facility.   PwC reached this conclusion in the absence of any evidence that Crowe (or anyone else) had tested any internal controls for AOT – a clear violation of AS No. 5.

37.     Had PwC properly performed AS No. 5 audit procedures as it was required to do, it would certainly have discovered that Crowe never performed any evaluation of internal controls relating to the AOT facility, precluding reliance on the effectiveness of such controls and triggering a need for additional audit procedures, including confirmation of AOT trades directly with end investors. Given the high percentage of fraudulent Plan B trades in the AOT facility (estimated at 40 percent of the total value of outstanding trades), confirmation with AOT end investors would have uncovered the TBW fraud, leading to a cessation of lending to TBW which, in turn, would have avoided the losses Colonial incurred thereafter.

c.   Failure to Audit Colonial's AOT Account Balance

38.   The main substantive audit procedure PwC performed to test the $1.5 billion AOT balance at December 31, 2007, was to obtain a written confirmation from TBW for the entire balance.  This procedure totally disregarded potential fraud risk and based PwC's unqualified audit opinion on unreliable evidence. Professional standards required the application of more robust audit procedures for the AOT facility, such as confirming with end investors the validity of takeout commitments or subsequent-events testing to trace funds coming from end investors after year-end and comparing such cash receipts to the underlying settlement documents and cash receipts records.  Instead, PwC effectively treated the AOT facility as a loan to TBW and simply confirmed the entire $1.5 billion outstanding balance with TBW alone.

39.   PwC planned to count and verify the AOT collateral, but as the audit was conducted PwC failed to do this because of a representation from management that BancGroup had incurred no losses in the MWLD.  On its face, this justification for abandoning a planned audit procedure makes no sense. Furthermore, this representation of no losses was highly suspect given the significant number of mortgage loans financed by the MWLD, the well-known decline in credit markets during 2007, and evidence obtained by PwC that large numbers of COLB loans were defective and increasingly could not be sold in the

secondary market.   Under these circumstances the suggestion of no loss should have been seen as a potential indication of fraud.   PwC's failure to verify AOT collateral violated AU Sections 316 and 326.

40.   PwC breached its duty under GAAS to exercise appropriate professional skepticism by failing to question how Colonial, particularly during an unfolding economic crisis in credit markets, had funded billions of dollars of mortgages over the years without ever experiencing a loss.  Had PwC attempted to count collateral to verify its existence, such as by examining documents underlying AOT trades, it would have discovered fraudulent AOT transactions given that an estimated 40 percent of them had no collateral.   This was yet another missed opportunity by PwC to put itself in a position to detect the TBW fraud by following required audit procedures.   This failure was a violation of AU Sections 230, 316, and 326.

41.   PwC determined that reconciliations of Colonial's Treasury accounts were a key control, and thus PwC selected for testing a general ledger account within which AOT was a significant sub-account.  PwC ultimately concluded that key controls relating to this reconciliation process were effective.  But PwC had no supporting documentation to rely upon to reconcile general ledger account balances.   Proper supporting documentation typically involves a detailed trial balance listing all of the individual items (in this case, all AOT pools) that make up

the total balance of the account.  Upon information and belief, PwC simply relied on a report with a single line entry for the entire $1.5 billion TBW AOT account balance.  Given that this report lacked any detail about the individual loan pools (or trades) purportedly comprising the total AOT balance, the documentation that PwC relied on provided neither reliable nor reasonable support for its unqualified opinion in violation of AU Section 326.

42.    If PwC had obtained detailed support for Colonial's AOT trades, it is doubtful that any reliable or reasonable evidence could have been provided, because an estimated 40 percent of AOT trades were bogus.  Insisting upon appropriate detail to conduct these reconciliations is yet another audit procedure that, had PwC used it, would have led PwC to discover the TBW fraud during 2007.

43.    PwC also planned to select mortgage loans from a detailed list of all loans held for sale or investment and test them against appropriate supporting documentation, such as wire transfer documents or mortgage notes.  Instead of carrying out this procedure, PwC relied on a report created by Kissick purporting to list 107 AOT trades totaling over $584 million as of year-end 2007 that TBW supposedly repaid through re-sale or securitization of the loans during January 2008.  PwC failed to select any items from this report to confirm with supporting documentation (such as Trade Assignment Agreements, payment records, or

confirmations from end investors).  Nor did PwC trace any of the individual trades that Kissick listed to an entire listing of all trades making up the $1.5 billion AOT balance at year-end 2007.

44.    PwC also planned to select from details making up a financial statement entry and then obtain appropriate and reliable audit evidence to support the reasonableness of the test selection.   PwC ignored both of these planned procedures, causing it to rely on insufficient audit evidence to support its unqualified opinion in violation of AU Section 326.  Had PwC attempted to verify the securitization and sale of AOT pools, it would have been unable to do so given that fake pools made up an estimated 40 percent or more of the total AOT balance, resulting in discovery of the TBW fraud.

d.    Failure to Investigate Material Confirmation Discrepancy

45.    In response to an audit confirmation request regarding TBW's mortgage warehouse line, TBW reported that its total mortgage warehouse line was $105.7 million – almost $20 million less than the $125.3 million total on Colonial's books.[2]  Such a material difference cannot be accepted by the auditor without further analysis but, inexplicably, PwC completely missed this material difference and concluded that TBW's confirmation agreed to CBG's general

---

[2]    This was an additional line of credit for financing that the MWLD extended to TBW. TBW's confirmation also identified the "CB Portion" of the total line at nearly $6.6 million, compared with Colonial's records that showed the balance at $19.5 million, another material difference.

ledger.  In violation of applicable professional standards, PwC failed to investigate this audit exception, failed to increase its assessment of risk, and failed to implement additional substantive audit procedures in light of the heightened risk. Follow-up procedures would have revealed that the TBW balance could not be confirmed.

46.    PwC's audit confirmation procedures also were grossly deficient in light of the potential fraud risks relating to TBW.  (AU Section 316).  The confirmation evidence that PwC obtained was unreliable. (AU Section 326).  PwC violated GAAS with respect to confirmation control (AU Section 330), proficiency of its auditors (AU Section 210), lack of supervision by senior auditors (AU Section 311), and the failure to exercise due professional care and appropriate professional skepticism. (AU Section 230).

e.    Failure to Investigate Stale TBW Loans in COLB Account

47.    A year-end 2007 aging analysis of COLB loans under the COLB agreements in effect at the time showed that loans totaling $166 million had origination dates before July 1, 2007, meaning they had been on Colonial's books for more than six months.  (PwC also had access to Crowe's workpapers which revealed that (1) in April 2006, the Bank had $272.7 million of outstanding TBW loans under the COLB facility that were more than 120 days old when the loans should have been paid for or repurchased within 60 days and (2) the Bank was not

sending violation notices for not being paid timely for loans that the Bank had sold and shipped.  *See* Paragraphs 73-74, *infra*.)  Kissick admitted that virtually all (99.6 percent) of the $166 million in loans had been originated by TBW.  Because COLB loans should have been sold within a short period (30-60 days), this was a clear sign of a serious potential problem.  Kissick told PwC that these loans had not been sold due to documentation exceptions that disqualified them for sale to the secondary market.  Upon information and belief, PwC never questioned why large numbers of aged and defective mortgage loans from TBW were being held for sale by Colonial in the COLB facility rather than being put back to TBW in accordance with the Loan Participation and Sale Agreement requiring TBW to repurchase such loans.  PwC justified its failure to investigate this serious potential problem on the grounds that it perceived no valuation issues specific to the loans. This "justification" strains credulity because if these loans could not be sold due to documentation deficiencies as Kissick had represented, simple logic suggests that their valuation was in question if not impaired.   A reasonable auditor with appropriate skepticism would not have let the matter drop, yet PwC did in violation of AU Sections 210, 230, and 316.

48.    With very large numbers of loans acknowledged to be defective, PwC should have suspected a serious breakdown in internal controls designed to prevent loans from being warehoused indefinitely on the COLB facility.   Accepting

management's explanation that no valuation issues arose from such aged loans in a facility designed to keep loans for only 30-60 days is demonstrative of PwC's failure to exercise due professional care in the performance of the audit and obtain sufficient competent evidential matter in violation of AU Sections 230 and 326. At the very least, PwC should have made a fair-value determination for a representative sample of these defective loans. Had it done so, it would have discovered substantial valuation issues that would have necessitated a more extensive investigation of the MWLD's dealings with TBW, leading to the discovery of the TBW fraud.

    f. <u>Approval of Erroneous Sales Accounting Treatment of COLB Loans</u>

  49. While appropriately recognizing that Colonial owned a 99 percent participation interest in the COLB loans, PwC nonetheless negligently treated COLB loan financing to TBW as a purchase of loans from TBW to be held for sale to end investors rather than as an extension of credit to allow TBW to make loans. Sales treatment allowed TBW to remove COLB loans from its balance sheet and free up its mortgage warehouse line of credit. This was a significant accounting determination that enabled TBW to obtain financing without regard to Colonial's regulatory lending limits on the amount of loans Colonial could make to a single borrower.

50.    GAAP does not permit sales treatment accounting if either the right to pledge or exchange an asset purchased by the "buyer" (Colonial) is constrained or the "seller" (TBW) maintains effective control over the asset after the "sale."  Both prohibited features were present in Colonial's COLB transactions with TBW in that Colonial was required to sell the loans in the COLB facility to the end investor designated by TBW, and thus sales treatment accounting under GAAP was inappropriate for financial reporting purposes.  Moreover, it is a well-established accounting principle that transactions should be recorded for accounting purposes in accordance with their economic substance rather than their characterization or technical legal form. (Statement of Financial Accounting Concepts No. 2 – Qualitative Characteristics of Accounting Information.  ¶ 160).  PwC knew that notwithstanding the fact that Colonial had a 99 percent ownership share in the loans, the COLB facility was in reality a lending arrangement to accommodate the desire of MWLD customers to move mortgage loans off-balance-sheet.

51.    In April 2008, the Office of the Comptroller of the Currency ("OCC") questioned the validity of accounting for COLB loans as sales in light of Colonial's obligation to sell the loans to end investors at the direction of its customers.  The OCC's challenge put Colonial and PwC in a difficult position of attempting to justify several years of accounting for COLB loans as sales.  PwC knew that the COLB agreement appeared to require Colonial, on instruction from its customer, to

sell COLB loans under the terms of the customer's purchase commitments to end investors and thus did not comport with GAAP's requirements for sales treatment accounting.  PwC thus knew that it needed further support for its position and that it lacked appropriate audit evidence to support its unqualified opinions for 2007 and prior years.   The stakes were very high because of the likelihood that insufficient evidence to justify sales treatment would inevitably require a restatement of BancGroup's financial reporting for 2005 and subsequent years – an event the Bank likely could not have survived.

52.   Despite concerns raised by the OCC and the lack of appropriate audit evidence for PwC's prior audit opinions, PwC ultimately stood by its sales treatment accounting of COLB loans, acting as more of an advocate for Colonial than an independent auditor.  To justify sales treatment accounting, PwC relied on Colonial management's representation that post hoc confirmations requested from six customers other than TBW that had also sold COLB loans to Colonial stated that, while the customer supposedly had an "implied option" to re-acquire the loan and sell it to the end investor, Colonial could effectively nullify this option by purchasing the customer's retained one percent interest and thereby hold all rights to the loan.  These six confirmations, which came from highly biased sources who, upon information and belief, had a strong financial need to continue their over lending limits financing from Colonial, failed to provide PwC with the sufficient

competent evidential matter required by AU § 326 to conclude that Colonial's rights were not restricted and that the sellers did not maintain effective control over the assets.

53.   Upon information and belief, Colonial at no time purchased TBW's one percent interest in COLB loans, nor did Colonial fail to deliver COLB loans to takeout investors in accordance with TBW's instructions.

54.   Had COLB transactions been recorded for accounting purposes as loans instead of sales, Colonial would have had to restate several prior years' financial statements and likely would have incurred serious economic consequences – facts of which PwC was certainly aware.  Moreover, Colonial's legal lending limits to a single borrower would not have allowed Colonial to continue lending money to TBW after February 2008.  Thus, losses attributed to the TBW fraud after February 2008 would have been avoided if PwC had (a) fulfilled its duty to be independent, (b) exercised objective professional judgment (without subordinating its judgment to its client's wishes), (c) exhibited an appropriate level of professional skepticism of management's representations and application of accounting standards, and (d) evaluated the sales treatment issue properly.

55.    On February 25, 2008, PwC issued its unqualified audit opinion, misrepresenting to Colonial and BancGroup that the consolidated financial statements were presented fairly in all material respects.

**D.  Crowe's Engagement and Failure to Follow Professional Standards**

56.    Pursuant to annually executed engagement letters with BancGroup, Crowe agreed to provide professional consulting services for Colonial that included (a) meeting with management and assisting in developing an annual risk-based internal audit services plan, (b) assisting the Internal Audit Liaison in determining risks to be reviewed and recommending testing procedures, (c) assisting in developing control risk assessments, audit plans, audit programs, and audit reports, (d) developing key internal controls for significant financial statement accounts and performing tests to assess the effectiveness of key controls as required by Section 404 of the Sarbanes-Oxley Act of 2002 ("SOX 404"), (e) reviewing key internal controls for all significant accounts and performing detail testing of a sample of transactions, and (f) directing, reviewing, and supervising the day-to-day execution of the internal audit plan.  In particular, the services provided by Crowe included SOX 404 testing of internal controls for all significant accounts identified by Crowe, which included Colonial's AOT facility.

57.    As a member of the AICPA, Crowe was required to comply with the AICPA Code of Professional Conduct and the AICPA Consulting Standards

(collectively, "AICPA Standards") with respect to outsourced internal audit services it provided to BancGroup and Colonial. These standards required Crowe to (a) exercise due professional care, which requires a member to plan and supervise adequately any professional activity for which he or she is responsible, (b) undertake only those professional services that the member or the member's firm can reasonably expect to be completed with professional competence, (c) obtain sufficient relevant data to afford a reasonable basis for conclusions or recommendations in relation to any professional services performed. In addition, pursuant to the AICPA Consulting Standards, Crowe was obligated to establish with BancGroup an understanding about the responsibilities it was undertaking and the nature, scope, and limitations of services to be performed and to modify that understanding if circumstances required a significant change during the engagement.

58.     In connection with providing internal audit services to BancGroup and Colonial, Crowe was obligated to perform risk assessments and make a determination of risks for Colonial under the terms of its engagement and applicable professional standards, including the AICPA Standards and The Institute of Internal Auditors Standards for the Professional Practice of Internal Auditing ("IIA Standards"). In addition, the Risk Assessments and Internal Audit Plans that Crowe prepared required Crowe to discuss with management "the risks

of the organization."   The scope of the risk assessments was to include the "business profile" of Colonial and was to "determine the risks of the organization," and to "customize the annual audit approach to the particular risks and needs of the organization."

59.    Pursuant to the Crowe engagement letter, AICPA Standards, IIA Standards, and Crowe's own statements, Crowe was responsible for: (1) identifying risks relating to Colonial's AOT loan pools, (2) informing management of those risks and the controls needed to address them, (3) recommending internal audit tests to determine if such controls were in place and effective, (4) making sure that, if Crowe itself was not performing any such tests, management was so informed, and (5) ensuring that internal audit tests of Colonial's AOT loan pools were adequately performed (whether or not Crowe performed the testing) and the results communicated to management.   In addition, Crowe had to give its overall assessment of risk in Colonial's operations and meet the needs of management.

60.    Colonial's reported MWLD assets grew to more than $3.3 billion by year-end 2007 and comprised 13 percent of Colonial's assets.   The rapid growth of the MWLD increased Colonial's fraud risks, especially in light of the falling real estate markets and the collapse of the private secondary market, yet Crowe paid little attention to the risks and internal controls affecting that division.

### 1. Negligent Failure To Understand and Address Risks Affecting AOT Loan Pools

61.     The rapidly increasing AOT account balance was $605.9 million at the end of 2006 and $1.55 billion at the end of 2007.   Although AOT was a significant part of MWLD's business and was concentrated in one customer (TBW), AOT loan pools were excluded entirely from the scope of the internal audit procedures that Crowe performed.   Crowe's work papers from 2006 and 2007 reveal that Crowe failed to appreciate that AOTs were different from any other type of transaction within Colonial.   Unlike COLB loans, for example, the details of the individual loans comprising the mortgage pools (or trades) were not maintained on the Bank's Pro-Merit loan-tracking software system.   Thus, internal controls appropriate for COLB loans were not appropriate for risks arising from AOTs.   Crowe failed to grasp this crucial point.

62.     None of the MWLD process diagrams in Crowe's work papers depict transactions or the flow of funds and collateral relating to Colonial's AOT transactions.   The complete lack of documentation in Crowe's work papers for such a significant and distinct line of Colonial's business demonstrates that Crowe failed to evaluate the risks of AOTs and the related controls as part of its overall assessment of Colonial's operations and design of internal audit plans in violation of IIA Standards 1220, 2010, 2110, 2120, 2201, and AICPA Standards ET 201 and CS 100.

## 2. Negligent Failure to Identify Key Controls Relating to AOT

63.    In conformity with SOX 404 requirements, Crowe prepared a Financial Statement Internal Controls Map ("Internal Controls Map"), which identified Colonial accounts for which the risk of financial misstatement could be significant.  The accounts were to be analyzed to identify applicable controls that would address risks specifically relating to the potential misstatement of the corresponding financial statement balance.  The control procedures were then to be "mapped" to the operations of the Bank where controls had been (or should have been) implemented so that SOX 404 tests of the effectiveness of key controls could be performed by Crowe.   The Internal Controls Map identified "Securities purchased under agreement to resell" (an asset reported on BancGroup's Balance Sheet consisting primarily of AOTs) as a significant area for potential misstatement.  Despite Crowe's recognition of the risk of misstatement as reflected in the Internal Controls Map, Crowe failed to analyze this "significant" and unique class of transactions to identify (a) the controls that would address the risk of financial statement misstatement and (b) each area of the Bank where such controls should have been implemented.  In both the 2006 and 2007 audit cycles, Crowe failed to identify any key controls specifically relating to AOTs and failed to perform any SOX 404 tests to determine if appropriate internal controls were in place and were operating effectively.

64.    Although Crowe's internal audit program for Colonial essentially ignored AOTs, Crowe did identify several risk factors and internal controls for SOX 404 testing of controls generally for secondary market lending operations. Those controls would be relevant to Colonial's AOT facility because AOTs were sold to investors in the secondary market.  The procedures Crowe identified for secondary market lending operations included confirming trades with end investors and conducting appropriate follow-up on unconfirmed trades and confirmation discrepancies.  However, Crowe dismissed these risks and deemed the controls not to be applicable to Colonial based on the uncorroborated representations of Colonial's SVP of Retail Mortgage Banking.  In violation of IIA Standards 1220, 2010, 2110, 2120, 2201 and AICPA Standards ET 201 and CS 100, Crowe performed no analysis of the AOT operation to reach this conclusion and failed to identify or test the very controls that Crowe mentioned for transactions involving sales to the secondary market.

65.    Had Crowe recommended that specific controls were necessary for Colonial's AOTs and had Crowe tested controls relating to the confirmation of AOT trades with end investors, the fraudulent AOTs on Colonial's books would have been discovered given that an estimated 40 percent of AOT trades had no end investors because the trades were fraudulent.

### 3.  Negligent Failure to Test AOT Loan Collateral

66.    Crowe's internal audit program also included procedures to test mortgage loan collateral by selecting loans from "Pipeline Reports" generated by Colonial's ProMerit loan management and database software system and examining the corresponding collateral packages for each loan selected.[3]    As previously noted, the loan monitoring software (from which the Pipeline Reports were generated) did not track individual loan details for loans in AOT pools. Rather than perform collateral testing procedures tailored specifically for AOT loans, such as obtaining the loan-detail information from Colonial and examining the collateral, assignment of trade agreements, trade confirmations, and other supporting documents, Crowe excluded AOT loan collateral from these procedures entirely.  As a result, no collateral testing was conducted for the AOT facility that totaled approximately $1.5 billion at year-end 2007 and related entirely to mortgages purportedly originated by TBW.

67.    Having acknowledged the necessity of testing controls for collateral supporting MWLD loans maintained in the ProMerit loan management system, Crowe's failure to conduct reasonably equivalent procedures for loan collateral relating to AOTs was a critical error violating IIA Standards 1220, 2010, 2110,

---

[3]    Pipeline Reports provided loan-level detail for individual mortgage loans securing warehouse lines of credit and loans in the COLB facility, but they contained no such loan level detail for AOT loan pools.

2120, 2201 and AICPA Standards ET 201 and CS 100.  Had AOT loan collateral been tested in 2006 or 2007, Crowe would have discovered the TBW fraud because there was no collateral for an estimated 40 percent of the AOT pools.

### 4.  Negligent Reconciliation of the AOT Account Balance

68.    In 2006, Crowe identified $589.8 million of AOTs recorded in a Colonial account for Reverse Repurchase Agreements.   Crowe purported to reconcile this account balance to an unspecified report prepared by the MWLD. The only report Crowe referenced as support for the balance of the AOTs was a loan monitoring subsidiary report which provided only a summary entry consisting of a single line item that gave the total amount of all AOTs financed for TBW. Because this "report" contained no details of the individual loans or of the separate loan pools that made up the total AOT balance, by its nature it was not, nor could it have been considered by a technically proficient internal auditor to have been, reliable or reasonable support for the balance recorded in the Reverse Repurchase Agreements account.  It provided no information beyond the account balance itself, and thus Crowe's reliance on it violated IIA Standards 1210, 1220 and AICPA Standards ET 201 and CS 100.

69.    To comply with applicable professional standards requiring sufficient relevant data to provide a reasonable basis for conclusions regarding risks and internal controls, Crowe should have requested details for AOT trades, such as the

underlying Trade Assignment Agreements and information concerning the separate loan pools aggregated into the total AOT balance.  Crowe was negligent in failing to insist upon appropriate documentation to test the reconciliation controls relating to this major account balance.  Had Crowe performed tests to properly assess the effectiveness of Colonial's AOT reconciliation controls, it would have led to the discovery of the TBW fraud because individual mortgage loans did not exist for an estimated 40 percent of AOTs.

### 5.   Crowe's Negligent Failure to Assess Risks and Internal Control Deficiencies Identified by BancGroup's In-House Internal Auditor

70.    In 2004, Pam Vitto was hired as a full-time Senior Risk Officer reporting directly to the General Auditor in Montgomery.  Her responsibilities included auditing the MWLD's controls, including controls over the AOT facility created for TBW in late 2004.

71.    Applicable professional standards and the terms of Crowe's engagement with BancGroup imposed a duty on Crowe to evaluate Colonial's AOT controls, and Crowe failed to fulfill this obligation.  In particular, under AICPA Standards ET 201 and CS 100, Crowe was required to exercise due professional care in the performance of professional services, adequately plan and supervise the performance of professional services, and obtain sufficient relevant data to afford a basis for any conclusions.  In addition, Crowe was responsible not only for directing, reviewing, and supervising Vitto's internal audit activities, but

Crowe should have also considered the results and findings of her work as part of its assessment of controls needed by the Bank and advised the BancGroup Audit Committee of any weaknesses noted by Vitto. Crowe failed to do this in violation of AICPA consulting standards that required Crowe to serve the client's interest by accomplishing objectives established through an understanding with the client (AICPA CS 100.07), including the direct review and day-to-day supervision of the audit plan, as set forth in Crowe's engagement letter.

72.    For example, Vitto questioned Kissick about certain irregularities in loan aging and about evidence indicating that AOT pools were subject to "loan resetting." (Loan resetting refers to such acts as changing the funding dates on loans to remove them from the aged loan reports and thus conceal that such collateral may be impaired. Similarly, the dates on which loans were shipped to end investors were reset to conceal that end investor payment for such loans had been delayed beyond the period allowed by Colonial's policy.). Crowe knew or should have known about the irregularities questioned by Vitto, yet Crowe failed to take any action to address these fraud risks, and the Risk Assessments and Audit Plans prepared by Crowe make no mention of such serious fraud risks. Crowe's failure to assess risks and internal control deficiencies identified by Vitto, such as her questions concerning irregularities in loan resetting, was negligent and violated IIA Standards 1220, 2010, 2110, 2120, 2201 and AICPA Standards ET 201 and CS

100.  Had Crowe performed appropriate review and follow-up of Vitto's concerns, issues concerning Kissick's circumvention of Colonial's internal control procedures would have come to light and the TBW fraud would have been discovered.

### 6.  Negligent Failure to Identify and Address the Risks of Aged COLB Loans and Loans Shipped Not Paid

73.    Crowe's MWLD internal audit plan incorporated various procedures to test aged loans to ensure that key controls were in place and were operating effectively.   After performing the procedures in 2006, Crowe found "no exceptions" worthy of reporting to BancGroup's Audit Committee.   Yet Crowe's own work papers contradict this conclusion.   During the 2006 audit, Crowe discovered serious internal control issues, including:

    a.    Colonial was improperly parking in a "held for sale" account (i.e., the COLB facility) loans that had been rejected by end investors instead of putting the loans back to the originator (such as TBW), as it had a contractual right to do, and

    b.    Violation notices that were supposed to be sent to end investors for loans Colonial had "shipped" but for which Colonial was not paid after 60 days were not being sent.   Instead of reporting this serious issue to management, Crowe simply accepted Kissick's explanation that the notices did not have to be sent within a specific period of time frame because, in light of economic pressures, the MWLD was trying to accommodate customers that were having difficulties selling loans by not imposing strict policies and penalties.

74.    Aged-loan reports for April 2006 given to Crowe showed $272.7 million of outstanding TBW loans under the then existing COLB facility that were

aged over 120 days, when the loans normally were to have been repaid by TBW or an end investor within 60 days.  Crowe's own work papers thus establish that Crowe in fact was aware that there were significant concerns relating to unsold and aged loans as well as loans sold without payment to Colonial under the then existing COLB facility.  Crowe failed to cite these as exceptions and to question why Colonial would hold for sale defective loans rather than put them back to TBW as it had a contractual right to do.  These failures violated IIA Standards 1220, 2010, 2110, 2120, 2201, 2400 and AICPA Standards ET 201 and CS 100.  At the very least, Crowe should have reported such significant problems as an exception, but it did not do so.  Under the then existing COLB facility, Colonial incurred significant losses from the TBW fraud for loans pledged to multiple parties that Colonial shipped to investors but for which Colonial was not paid.

75.    Crowe failed to recognize the significant risks resulting from the substantial amount of aged TBW loans accumulating in the then existing COLB facility.  Crowe had evidence that the MWLD was circumventing Colonial's internal controls relating to shipped but not paid loans and to TBW's mortgage warehouse credit line by not requiring timely payment for shipped loans and allowing impaired and unmarketable TBW mortgage loans to be warehoused in the COLB facility as Loans Held for Sale.  Crowe was negligent in failing to report to higher management serious material control weaknesses and steps taken to

override key controls relating to aged COLB loans.   These failures violated Crowe's obligations under AICPA Standard CS 100.07 to communicate significant engagement findings, as well as IIA Standards set forth in Section 2400 requiring Crowe to "communicate the engagement results promptly."   If Crowe had reported these violations, the Bank could have invoked its rights under agreements with TBW and demanded timely payment for shipped loans and the repurchase of the significantly aged TBW loans in the then existing COLB facility.   TBW would not have been able to comply, the risk of double and triple pledging of loans would have arrested, and the defective nature of the aged loans would have been discovered earlier, reducing Colonial's losses from the TBW fraud.

### 7.  Deficient Reports and Erroneous Conclusion That Controls in Place in the MWLD Were Adequate

76.   Given that Colonial's AOTs were a separate class of MWLD transactions extended to TBW alone, Crowe was required by applicable professional standards to obtain an understanding of AOT transactions and related internal controls as part of its risk assessment and design of an audit plan that would enable BancGroup management to comply with its SOX 404 requirements. Furthermore, if Crowe understood that these or any other transactions were not within the scope of its MWLD Internal Audit, applicable professional standards such as IIA Standard 2020 and AICPA Standard CS 100.07 required Crowe to communicate that understanding to BancGroup management to avoid any

confusion or erroneous belief that Crowe would test such transactions and controls. In addition, Crowe also was required to communicate the serious risks and violations of internal controls relating to the aged COLB loans and loans shipped not paid.

77.     Crowe's 2006 and 2007 Internal Audit Reports for Colonial's MWLD and Treasury operations failed to communicate any risks or control issues regarding AOT and ignored the risks that Crowe had discovered relating to aged COLB loans and loans shipped not paid.  Similarly, Crowe's Risk Assessment and Internal Audit Plans for 2006 and 2007 also made no mention of specific risks or controls relating to Colonial's AOTs.  Nor did they discuss any particular audit plan or audit procedures to address risks of which Crowe was or should have been aware, including (1) significantly aged loans in the then existing COLB facility, (2) loans shipped not paid for extended periods of time, (3) concerns regarding irregularities in loan aging reports, or (4) evidence indicating loan resetting on AOT pools.  Had Crowe properly evaluated the risks and controls relating to AOTs and reported the internal control deficiencies that it did observe (and others it should have observed), the fraudulent loans and loan pools would have been discovered no later than December 31, 2007.

### IV. CLAIMS FOR RELIEF

### Count I
Professional Negligence
(Against PwC and Crowe)

78.     The FDIC incorporates paragraphs 6-77 into this claim for relief.

79.     PwC and Crowe owed Colonial a duty to perform their audits and professional services in accordance with applicable professional standards.   As alleged more fully herein, PwC breached its duty in at least the following ways, among others:

a.  failing to obtain a sufficient understanding of Colonial's mortgage warehouse lending line of business to properly plan the audit and design effective audit procedures to address specific risks of material misstatement due to fraud, reduce audit risk to an acceptably low level, and obtain sufficient competent evidential matter to support its audit opinion;

b.  failing to consider the significant increase in fraud risks relating to Colonial's mortgage warehouse lending line of business caused by the financial and economic crisis in the U.S. that was adversely impacting liquidity in the mortgage markets;

c.  approving and advocating for sales treatment accounting for loans in the MWLD COLB facility when accounting standards required that such loan "purchases" be treated as a financing transaction (i.e. loans to Colonial's mortgage banking customers that utilized the COLB facility instead of Colonial loans held for sale);

d.  failing to count or verify the collateral securing loan pools in the AOT facility;

e.  failing to investigate why Colonial was holding a significant volume of stale loans purchased from TBW rather than requiring TBW to repurchase the loans;

f.  failing to employ appropriate audit procedures for Colonial's AOT account;

g.  failing to identify reportable conditions and material weaknesses in BancGroup's internal control over financial reporting, particularly with respect to the manner in which Colonial's Treasury area maintained control over AOT collateral and reconciled the balance of AOTs recorded as Securities Purchased Under Agreements to Resell;

h.  failing to recognize that the scope of work performed by Crowe was not sufficient to meet the requirements of SOX 404 and, in particular, did not adequately address key controls in the Treasury area relating to maintaining control over AOT collateral and reconciling the balance of AOTs recorded as Securities Purchased Under Agreements to Resell;

i.  failing to require sufficiently persuasive evidence to support its conclusions and Colonial management's material accounting estimates and representations;

j.  failing to investigate a material discrepancy in TBW's confirmation response;

k.  failing to design more effective and robust audit procedures in response to inconsistencies observed during its audit;

l.  failing to corroborate management's explanations and representations concerning material matters, in spite of the fact that certain of these representations were patently unreasonable on their face.

80.  Each of PwC's cited failures above violated one or more of the following applicable professional standards:

- AU 210 – Training and Proficiency of the Independent Auditor

- AU 220 – Independence

- AU 230 – Due Professional Care in the Performance of Work

- AU 311 – Planning and Supervision

- AU 312 – Audit Risk and Materiality in Conducting an Audit

- AU 316 – Consideration of Fraud in a Financial Statement Audit

- AU 317 – Illegal Acts by Clients

- AU 322 – The Auditor's Consideration of the Internal Audit Function in an Audit of Financial Statements

- AU 325 – Communication of Internal Control Related Matters Noted in an Audit

- AU 326 – Evidential Matter

- AU 328 – Auditing Fair Value Measurements and Disclosures

- AU 330 – The Confirmation Process

- AU 332 – Auditing Derivative Instruments, Hedging Activities, and Investment Securities

- AU 333 – Management Representations

- AU 336 – Using the Work of a Specialist

- AU 342 – Auditing Accounting Estimates

- AU 350 – Audit Sampling

- AU 380 – Communications With Audit Committee

- AU 410 - Adherence to Generally Accepted Accounting Principles

- AU 411 – The Meaning of Present Fairly in Conformity With Generally Accepted Accounting Principles

- AU 508 – Reports on Audited Financial Statements

- AU 560 – Subsequent Events

- AU 561 – Subsequent Discovery of Facts Existing at the Date of the
  Auditor's Report

- AU 722 – Interim Financial Reporting

- AS No. 3 – Audit Documentation

- AS No. 5 – An Audit of Internal Control Over Financial Reporting That is
  Integrated with an Audit of Financial Statements

81.    In addition, the following violations of applicable professional standards and SEC Rules governing Auditor Independence occurred as a result of the improper sales accounting identified in subparagraph c above:

- AICPA Code of Professional Conduct: ET § 52 Article I – Responsibilities,
  ET § 53 Article II – The Public Interest, ET § 54 Article III – Integrity, ET §
  55 Article IV – Objectivity and Independence, ET § 56 Article V – Due
  Care, ET § 201 General Standards, ET § 202 Compliance With Standards,
  ET § 203 Accounting Principles, ET § 501 Acts Discreditable

- PCAOB Rule 3502 – Responsibility Not to Knowingly or Recklessly
  Contribute to Violations, Rule 3520 Auditor Independence

- Rule 2-01 of Regulation S-X Under the Securities and Exchange Act of
  1934.

82.    As alleged more fully herein, Crowe breached its duty in at least the following ways, among others:

a.  failing to understand and address risks affecting AOT loan pools;

b.  failing to identify any key controls relating to AOT;

c.  failing to test AOT loan collateral;

d.  failing to properly reconcile the AOT account balance;

e.  failing to assess risks and internal control deficiencies identified by BancGroup's internal auditor;

f.  failing to identify and address the risks of aged COLB loans and loans shipped not paid;

g.  erroneously concluding and reporting that internal controls in Colonial's MWLD and Treasury area were adequate;

h.  failing to communicate to management its alleged belief that certain work critical to an accurate assessment of BancGroup's internal controls was not within the scope of its work;

83.   Each of Crowe's cited failures above violated one or more of the following applicable professional standards:

- AICPA Code of Professional Conduct: ET § 56 Article V – Due Care, ET § 201 General Standards

- AICPA Consulting Standards CS 100 Consulting Services: Definitions and Standards

- IIA Standards 1210 – Proficiency

- IIA Standards 1220 – Due Professional Care

- IIA Standards 2010 – Planning

- IIA Standards 2020 – Communication and Approval

- IIA Standards 2110 - Risk Management

- IIA Standards 2201 – Planning Considerations

- IIA Standards 2210 – Engagement Objectives

- IIA Standards 2220 – Engagement Scope

- IIA Standards 2340 – Engagement Supervision

- IIA Standards 2400 – Communicating Results

- IIA Standards 2420 – Quality of Communications

84.     PwC's and Crowe's work violated governing professional standards in many significant ways, and thus they missed several opportunities to identify one or more aspects of the TBW fraud.

85.     Had PwC and Crowe complied with applicable professional standards, they would have detected the TBW fraud several months before it was ultimately uncovered.  They would have been required to promptly communicate such fraud to Colonial and BancGroup which disclosure would have prompted immediate action by Colonial to terminate its relationship with TBW, thus avoiding or significantly reducing the losses that Colonial sustained.  Specifically, the losses Colonial sustained by continuing to advance money to TBW in return for nothing of value would have been arrested if PwC and Crowe had performed their audits in accordance with professional standards and reported the resulting findings to Colonial.  PwC's and Crowe's misconduct constituted such an extreme departure from professional standards as to constitute gross negligence.

86.     As a direct and proximate result of PwC's and Crowe's negligence, Colonial sustained significant damages in an amount to be proven at trial, but currently estimated to exceed $1 billion.

**Count II**
Gross Negligence
(Against PwC and Crowe)

87.   The FDIC incorporates paragraphs 6-86 into this claim for relief.

88.   The misconduct of PwC and Crowe described above constitutes gross

negligence.

89.   As a direct and proximate result of PwC's and Crowe's gross

negligence, Colonial sustained significant damages in an amount to be proven at

trial, but currently estimated to exceed $1 billion.

**Count III**
Breach of Contract
(Against PwC)

90.   The FDIC incorporates paragraphs 6-89 into this claim for relief.

91.   PwC entered into an engagement agreement with Colonial's parent

company, BancGroup, under which it committed to conduct its audits in

accordance with governing professional standards.   As noted above, upon

information and belief, PwC knew (a) that its audit of BancGroup's consolidated

financial statements served as Colonial's required audit under 12 U.S.C. § 1831m,

and that Colonial's primary banking regulators (the OCC at the time of PwC's

2007 audit and, subsequently, the FDIC and the Alabama State Banking

Department when Colonial changed from a federally chartered bank to a state

chartered bank in June 2008) relied on it for that purpose, and (b) that BancGroup

intended to deliver PwC's audit report to Colonial and that Colonial would rely on it.  Colonial was thus a known and intended third party beneficiary of BancGroup's agreements with PwC.

92.    As detailed above, PwC was obligated under its engagement letters to (a) perform its audit in accordance with standards established by the PCAOB, (b) design the audit to obtain reasonable assurance of detecting errors, fraud, or illegality that would have a material impact on financial statement amounts, and (c) obtain reasonable assurance that effective internal control over financial reporting was maintained in all material respects, which required PwC to obtain an understanding of internal controls over financial reporting, assess the risk that a material weakness existed, and test and evaluate the design and effectiveness of internal controls over financial reporting. PwC failed to comply with these contractual duties and related professional standards in numerous material respects and thus breached the obligations of the engagement agreements.

93.    PwC's breach of contract proximately caused significant damage to Colonial in an amount to be proven at trial, but currently estimated to exceed $1 billion.

94.    Upon information and belief, BancGroup performed, or substantially performed, its material obligations under the engagement letters.

**Count IV**
Negligent Misrepresentation
(Against PwC and Crowe)

95.    The FDIC incorporates paragraphs 6-94 into this claim for relief.

96.    As detailed above, PwC's 2007 audit opinion misrepresented that BancGroup's financial statements were fairly stated in all material respects and that effective internal controls over financial reporting were in place when, in reality, the financial statements were grossly misstated, and the internal controls were deficient.

97.    As detailed above, Crowe's 2006 and 2007 internal audit reports misrepresented that it had evaluated internal controls over mortgage warehouse lending, and that there were "no findings."  In fact, Crowe did nothing to evaluate controls over AOTs – a significant component of Colonial's mortgage warehouse lending.  Accordingly, Crowe's report of no findings gave the false impression that MWLD controls – including controls over AOTs – were in place and functioning effectively.  Moreover, Crowe discovered that (a) Colonial was improperly parking in a "held for sale" account loans that had been rejected by end investors, (b) violation notices were not being sent to end investors that had not paid for loans that Colonial had shipped, and (c) $310 million of TBW loans were aged over 120 days when they should have been sold to an end investor within 60 days.  Crowe's representation of "no findings" with respect to the MWLD was false.

98.    For   the   reasons   set   forth   above,   PwC's   and   Crowe's misrepresentations were negligent and grossly negligent.  Colonial was a known and intended recipient and user of PwC's and Crowe's audit opinions and reports, and PwC and Crowe knew that Colonial would rely on their opinions and reports. In justifiable reliance on PwC's and Crowe's opinions and reports, Colonial was deprived of the opportunity to take steps that it would have taken to mitigate losses if PwC's and Crowe's opinions and reports had been accurate and prepared in conformity with applicable professional standards.  PwC's and Crowe's negligent and grossly negligent misrepresentations proximately caused significant damage to Colonial in an amount to be proven at trial, but currently estimated to exceed $1 billion.

## V. PRAYER FOR RELIEF

For these reasons, the FDIC requests that the Court award the FDIC judgment against PwC and Crowe for

a.    actual damages in an amount to be proven at trial;

b.    prejudgment and post judgment interest as allowed by law;

c.    exemplary damages;

d.    costs of court;

e.    return of any and all fees paid that Colonial paid to PwC and Crowe for the negligent audits; and

f.   any other relief allowed by law and deemed appropriate by the Court.

## VI. JURY DEMAND

Plaintiff demands a jury trial in this matter.

Respectfully submitted this 20th day of September, 2013.

*/s/ James B. Perrine*
James B. Perrine (ASB-9077-E31J)

*Co-counsel for the Federal Deposit Insurance Corporation as Receiver of Colonial Bank*

OF COUNSEL:

**BAILEY & GLASSER, LLP**
James B. Perrine (ASB-9077-E31J)
3000 Riverchase Galleria, Suite 905
Birmingham, Alabama 35244
Telephone:  (205) 988-9253
Facsimile:   (205) 733-4896
Email:         jbperrine@baileyglasser.com

**MULLIN, HOARD & BROWN, LLP**
David Mullin (TX Bar No.14651600), *pro hac vice*
John M. Brown (TX Bar No. 3142500), *pro hac vice*
Clint Latham, (TX Bar No. 24013009), *pro hac vice*
500 South Taylor, Suite 800
Amarillo, Texas  79101
Telephone:  (806) 372-5050
Facsimile:   (806) 372-5086
Email:         dmullin@mhba.com
                  jobrown@mhba.com
                  clatham@mhba.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 20, 2013, a true and exact copy of the foregoing was caused to be served on the following by U.S. Mail, by electronic mail, and/or by electronically filing with the Clerk of the Court using the CM/ECF system:

Drew David Dropkin
Elizabeth V. Tanis
KING & SPALDING LLP
1180 Peachtree Street, NE
Atlanta, GA  30309

Tabor Robert Novak, Jr.
BALL BALL MATTHEWS & NOVAK PA
P.O. Box 2148
Montgomery, AL 36102-2148

Jonathan C. Medow
Stanley J. Parzen
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL  60606

James H. Anderson
JACKSON, ANDERSON & PATTY, P.C.
250 Commerce Street, Suite 100
Montgomery, Alabama 36102-1988

*/s/ James B. Perrine*
James B. Perrine